IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DANIEL RAY BROWN                                                    PLAINTIFF

        v.                          Civil No. 10-3006

SHERIFF DANNY HICKMAN;
DEPUTY RYAN WATSON;
and BOONE COUNTY, ARKANSAS                                          DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Daniel Ray Brown (hereinafter Brown), filed this action pursuant to the provisions of 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Brown is currently incarcerated in the North Central Unit of the Arkansas Department of Correction (ADC).  The events that are the subject of this lawsuit occurred in Boone County, Arkansas, in January and February of 2009.

Defendants have filed a summary judgment motion (Doc. 23). To assist Brown in responding to the summary judgment motion, I propounded a questionnaire.  Brown filed a timely response (Doc. 45) and submitted various exhibits for the Court's consideration.  The motion is now ready for decision.

## I.  Background

On January 2, 2009, Deputy Ryan Watson and Deputy Darrell Earnhart stopped a car for running a stop sign at about 9:00 p.m. at the intersection of Old Capps Road and Estes Road in Capps, Arkansas. *Plaintiff's Response* (Doc. 45)(hereinafter *Resp.*) at ¶ 1. Brown was driving a black ford pickup with no tags.  *Id.* at ¶ 2.  The officers saw Brown stop and back up going down Old Capps road.  *Id.* at ¶ 3.  Brown then pulled into the Capps Mini Storage Units.  *Id.*

According to Watson, both Brian Langston and Rachel Maybee were in Brown's vehicle. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1 at page 2. Brown, however, contends Langston was not in his vehicle. *Resp.* at ¶¶ 4 & 9.

According to Watson, Brown was nervous and could not stand still. *Defts' Ex.* 1 at pg. 2. Watson's report indicates it was discovered Brown had two failure to appear charges stemming from an original charge of shoplifting. *Id.* Watson had Brown perform field sobriety tests. *Defts' Ex.* 1 at pg. 2; *Resp.* at ¶ 6. Watson reported that Brown could not keep his balance, double counted, and was unable to perform a heel to toe walk. *Defts' Ex.* 1 at pg. 2. Brown was arrested for DWI--drugs. *Id.; Resp.* at ¶ 8. Watson indicated that drugs and drug paraphernalia were found in Brown's vehicle. *Defts' Ex.* 1 at pg. 2.

Brown, however, denies he could not stand still. *Resp.* at ¶ 5. With respect to the field sobriety tests, Brown states he was simply tired from moving things into his storage. *Id.* at ¶ 7. Brown indicates he tried to explain this to Watson. *Id.* With respect to the alleged failure to appear charges, Brown maintains the Boone County Dispatch Log shows no evidence of an Arkansas Crime Information Center (ACIC) check. *Id.* at ¶ 5.

Langston was also arrested. *Resp.* at ¶ 10. The vehicle was towed and Brown and Langston were taken to Boone County Jail to be booked in. *Id.* at ¶ 11. Maybee was allowed to go on her way. *Id.*

On January 3rd, after his release from jail, Brown received a phone call from the owner of the storage units informing him that his unit had been left open all night. *Resp.* at ¶ 47(I). Brown went to the unit to secure it and states he discovered many valuable and sentimental items missing. *Id.* at ¶ 47(J). Initially, Brown believed the items had been confiscated. *Id.*

It was not until January 22nd, that Brown states he realized the property had not been confiscated by the Criminal Investigation Division (CID). *Resp.* at ¶ 47(K). He maintains the Sheriff's Office and Watson were responsible and that he wanted his things found or compensation for the items. *Id.* at ¶ 47(L).

According to Defendants, on January 7th, at approximately 9:50 p.m., Watson was dispatched to Valley View Church Road after a call was received about a black Ford pickup sitting on the side of the road. *Defts' Ex.* 8. Brown argues the dispatch log contains no such entry. *Resp.* at ¶ 13; *Plff's Ex.* 3.

Brown and Maybee were the occupants of the pick up and told Watson that the fuel line was broken. *Resp.* at ¶ 14. According to Watson, Brown gave him permission to search the pickup. *Defts' Ex.* 8. Brown, however, states he was asked about the contents in the back of the truck and told Watson it was the same items that were in the truck on January 2nd. *Resp.* at ¶ 15. Brown maintains Watson illegally searched the cab of the pickup. *Id.*

While a digital scale was found, Brown states he told Watson it was a jewelry scale. *Resp.* at ¶ 16. Brown denies any white powdery residue, consistent with methamphetamine was found. *Id.*

Brown's truck was towed to Harold's Wrecker Yard and Brown and Maybee were arrested and taken to Boone County Jail. *Resp.* at ¶ 17. On January 8th, a list was made of all property contained in Brown's pick-up truck at Harold's Wrecker Service. *Id.* at ¶ 18.

According to Defendants, they confiscated the property for investigative purposes because it was suspected to be stolen property. *Defts' Ex.* 3. Brown, however, states it was the same property that had been there five days earlier. *Resp.* at ¶ 19. Brown states Watson also knew he was moving. *Id.* Brown maintains Watson made the incident appear suspicious because Brown's parole officer

-3-

had not put a hold on him five days earlier.  *Id.*

The property receipt was three pages long and contained a variety of items.  *Resp.* at ¶ 20. Brown signed the receipt on January 8th and on January 22nd.  *Id.*  Photographs were taken of the speakers and cases found in Brown's truck.  *Id.* at ¶ 21.

On January 13, 2009, Brown submitted a grievance complaining his property had been detained for five days.  *Resp.* at ¶ 22.  Brown asked that it be released to a family member or friend. *Id.*  He said none of the property was stolen.  *Id.*

In response, Brown was told that the property was still being investigated and would be kept until all leads were exhausted.  *Resp.* at ¶ 23.  On January 16th, Brown complained that his property was being held longer than the law allows.  *Id.* at ¶ 24.

On January 17th, Brown submitted a grievance stating that his personal property had been detained for too long.  *Plff's Ex.* 5 at pg. 2.  He also indicated some of the property belonged to his Father and Mother.  *Id.*  In response, Brown was told that Officer Bob King said Brown would need to provide ownership of the property for it to be released.  *Id.*

On January 21st, Brown submitted a request asking for someone to call his Father to pick up all his property that had been held.  *Id.* at ¶ 25.  In response, Jason Day wrote that Brown's Father had picked the property up.  *Id.*  While his Father did pick up his property, Brown states his phones were never returned and evidence for his parole hearing was also withheld.  *Id.*

On January 21st, Watson completed an affidavit of probable causing asking for the arrest of Langston on various charges.  *Resp.* at ¶ 27.  On January 23rd, Brown complained that his storage unit was left open by Watson and Earnhart after his arrest on January 2nd.  *Resp.* at ¶ 28.  Brown stated it was open all night and many items were missing.  *Id.*  In response, Brown was told to finish

filling out the statement form he had been given by Sgt. Tom Smith and that the form would be turned over to the CID for an investigation. *Id.* at ¶ 29.

On January 23rd, Brown asked to be allowed to use the phone to call his Father, his girlfriend, and Maybee about his parole hearing. *Resp.* at ¶ 30. Brown also said he wanted his Father to pick up his property from his pickup. *Id.* In response Brown was told he would be allowed to use the phone if the deputies had time. *Resp.* at ¶ 30. However, Brown was told to make contact by mail. *Id.*

Brown also asked for Dusty Smith, his parole officer at the time, to provide him with an application for appointment of counsel. *Resp.* at ¶ 32. Brown's request was faxed to Dusty. *Id.*

On January 25th, Brown wrote a letter to the editor asking for help finding his personal property. *Resp.* at ¶ 33. On January 31st, Brown wrote to Sheriff Hickman complaining that there was no investigation into his stolen property and asking to speak to the Arkansas State Police. *Id.*

On January 31st, Brown complained that he needed legal materials. *Resp.* at ¶ 35. He also stated that he wanted to talk to someone from CID regarding the property stolen from him because of Watson's negligence. *Resp.* at ¶ 35. In response, Brown was told he was allowed to order all materials he needed for legal work. *Id.* CID was advised that Brown wanted to speak to them. *Id.*

On February 2nd, Sue Fallon told Captain Bob King that Brown wanted to know why CID had not responded to his stolen property report. *Resp.* at ¶ 43. On February 3rd, Brown complained his phones had not been released. *Id.* at ¶ 44. Brown also asked if he needed to fill out any additional forms regarding the stolen property. *Id.* In response, Brown was told that the police report regarding the stolen property was all that needed to be completed. *Id.* at ¶ 45. However, Day said he would check to confirm that. *Id.*

On February 3rd, Brown complained about being harassed by two deputies. *Resp.* at ¶ 37. Brown also said he needed to get his missing property, which he valued at over $30,000, back. *Id.* In response, Jason Day said he would speak to the officers and give CID a copy of his request. *Id.* at ¶ 38.

On February 3rd, Brown complained that his Father had not been given his cell phones or his money. *Resp.* at ¶ 39. He stated "word" was that Dusty Smith had them. *Id.* Brown stated the items had been held too long. *Id.* Brown also stated he needed to talk to CID about his missing property. *Id.* at ¶ 41. In response, Brown was told a copy of his grievance would be placed in CID's box. *Id.* at ¶ 42.

On February 4th, Investigator Bill Groves interviewed Brown about his complaints of mistreatment and theft of property from the storage unit. *Resp.* at ¶ 47(A). Watson was present during the interview. *Id.* at ¶ 47(B). According to Groves, Brown refused to cooperate telling Groves he had everything written down and would not say anything more without his attorney. *Defts' Ex.* 6 at pg. 2. Brown was advised he was not a suspect and Groves just wanted to hear his side of the story. *Id.*

Brown indicates he did not refuse to cooperate. *Resp.* at ¶ 47(C). Instead, Brown states he told Groves he had his statement. *Id.* Brown states he asked if his attorney could be present because he was being accused of thefts, had his property confiscated, and a parole hearing coming up. *Id.* Brown also points out that they were in an interrogation room and Watson was present. *Id.* at ¶¶ 47(C) & (D). Brown maintains Watson should have been interviewed separately. *Id.*

Brown attempted to ask Groves questions about who he had interviewed but he responded that it was his interview. *Resp.* at ¶ 47(E). At this point, Brown contends Groves stuck his finger

-6-

in Brown's face nearly drawing blood. *Id.* Later that day, Brown wrote a letter to Groves stating he did not like the manner in which he treated him or talked to him earlier in the day when he was investigating the theft of his property. *Id.* at ¶ 46.

On February 5th, Brown completed a three page statement setting forth what he believed had occurred with his property. *Resp.* at  ¶ 47(F). Brown stated that he was arrested on January 2nd while unloading items from his pick up into his storage unit. *Id.* at ¶ 47(G). Brown indicated he asked Watson to secure the storage unit but he said CID would do it. *Id.* at ¶ 47(H). Brown also stated that Watson and he believed the property was all stolen. *Id.* Brown's statement contained a list of items he believed were missing from his storage unit. *Id.* at ¶ 47(M).

On February 7th, Brown submitted a letter to Sheriff Hickman. *Resp.* at ¶ 48. He asked for his phone back and that Deputy Watson be kept away from him. *Id.* He also said he was not impressed by Groves' investigation on his stolen property. *Id.*

On February 9th, Brown outlined the witnesses and evidence he wanted at his parole hearing and stated he wanted Watson kept away from him. *Resp.* at ¶ 49. On February 18th, Brown requested a copy of the police report he had submitted about the theft of property. *Id.* at ¶ 50. In response, Brown was told his request would be sent to CID. *Id.* at ¶ 51. Brown agrees this is what he was told but does not believe it occurred. *Id.*

A letter dated February 19th from Lieutenant W.E. Beach with the Arkansas State Police and addressed to Brown at the jail indicated that the State Police could not investigate another law enforcement agency without a specific written request from the prosecuting attorney's office being made and approved by the State Police Director. *Defts' Ex.* 11. Brown states he was released from the jail on February 9th and never knew about this response. *Resp.* at ¶ 52

-7-

On March 19th, Kent Villines, in a violation report, recommended that Brown's conditional release be revoked and he be returned to the Arkansas Department of Correction. *Resp.* at ¶ 53. On April 30, 2010, Brown was arrested on a charge of obstruction of governmental operations. *Id.* at ¶ 54. A parole revocation hold was also placed on Brown. *Id.* at ¶ 55.

A warrant for retaking prisoner was issued on May 4, 2010. *Resp.* at ¶ 56. Brown received and signed a notice of parole violation form on May 4th. *Id.* at ¶ 57.

On May 12th, Brown requested a copy of his theft of property police report. *Resp.* at ¶ 58. In response, Brown was told that his request would be given to Groves. *Id.* Groves responded that he could not find a report in their system regarding a theft from a storage unit. *Id.* at ¶ 59.

Brown requested a copy of the police report again on May 18th. *Id.* at ¶ 60. In response, Brown was told there was no police report just his statement and his refusal to respond to questions about the theft. *Id.* at ¶ 61. On May 26, 2010, Brown was released after the parole office dropped the hold and because he had served his time on misdemeanor charges.

## II.  Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

## III.  Discussion

Defendants first argue they have been sued in their official capacities only. As there is no

evidence of an unconstitutional policy or custom they maintain they are entitled to judgment in their favor.   Second, they argue Brown cannot maintain a § 1983 claim based on the unauthorized confiscation of his property because he has an adequate post-deprivation remedy.  Finally, they argue alleged verbal abuse or harassment does not rise to the level of a constitutional violation.

### *Official versus Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).    The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits.  As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available.  *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).   Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself.  *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991).  Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised

-9-

as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). In this case, Brown did not explicitly state which capacity he was suing each Defendant in when he filed the complaint. However, he has now filed two motions to amend the complaint (Doc. 41 & Doc.44) and has also stated in his summary judgment response that he intended to assert claims against the Defendants in both their individual and official capacities. The motions to amend will be granted. For proposes of this motion, we will also construe the complaint as asserting claims against Defendants in both capacities.

### *Deprivation of Property*

This claim fails for two reasons. First, Plaintiff does not allege the missing property was intentionally taken or destroyed by any of the Defendants or was taken or destroyed at their direction. Inadvertence, negligence, or even gross negligence is insufficient to state a claim under § 1983. *See Sellers by and through Sellers v. Baer*, 28 F.3d 895, 902-03 (8th Cir.1994).

Second, even if the deprivation was intentional, Plaintiff has adequate post-deprivation remedies. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984)(intentional deprivation of property does not violate due process when meaningful post-deprivation remedy is available); *Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994)(negligent or intentional deprivation of prisoner's property fails to state claim under § 1983 if state has adequate post-deprivation remedy). Arkansas recognizes a conversion claim which will provide Plaintiff with an adequate remedy for his alleged injury. *See e.g., Elliot v. Hurst*, 307 Ark. 134, 817 S.W.2d 877, 880 (1991)(cause of action for conversion lies where distinct

act of dominion is exerted over property in denial of owner's right).

### Verbal Abuse and Harassment

Brown maintains Watson made false statements about him, contacted his parole officer in an effort to get Brown's parole revoked, and accused him of having both stolen property and drugs in his possession. "[D]efamation, *per se*, is not actionable under section 1983." *Underwood v. Pritchard*, 638 F.2d 60, 62 (8th Cir. 1981); *see also Wade v. Goodwin*, 843 F.2d 1150, 1152 (8th Cir. 1988)(A cause of action for damage to character or reputation is not cognizable under § 1983). The Supreme Court has held that a person's interest in his reputation is not considered liberty or property protected by the Due Process Clause. *Paul v. Davis*, 424 U.S. 693 (1976). Thus, "regardless of whom a plaintiff chooses to sue, section 1983 does not address an alleged injury to reputation." *Idema v. Wager*, 120 F. Supp. 2d 361, 371 (S.D.N.Y. 2000).

Similarly, verbal threats, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986)(a claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death").

-11-

## IV.  Conclusion

For the reasons stated, I recommend that Defendants' summary judgment motion (Doc. 23) be granted and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of March 2011.

/s/ *J. Marschewski*
_____
 HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE